An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-879

NORTH CAROLINA COURT OF APPEALS

Filed: 18 February 2014

STATE OF NORTH CAROLINA

v.

DAVID STEVENSON STOCKS, JR.

Wayne County
Nos. 12 CRS 50818-19

Appeal by Defendant from judgments entered 21 December 2012 by Judge Arnold O. Jones, II, in Wayne County Superior Court. Heard in the Court of Appeals 27 January 2014.

*Attorney General Roy Cooper, by Assistant Attorney General Barry H. Bloch, for the State.*

*W. Michael Spivey for Defendant.*

DILLON, Judge.

Defendant appeals from judgments entered upon his conviction of discharging a weapon into a moving vehicle and two counts of assault with a deadly weapon with intent to kill. After careful review, we find no plain error.

I. Background

The State adduced evidence that on 17 February 2012, Defendant's wife, Laura, announced that she was moving out of

their residence and taking their eight-year-old son with her. Laura also told Defendant that her brother, James Morgan, would be coming to the house the next morning to help her move. Defendant and Morgan had a history of "ill will" due in part to Defendant's relationship with Laura. Already "upset" about Laura's decision to move out, Defendant "told [her] that he didn't want [her] brother there."

On the morning of 18 February 2012, Defendant had a drink before borrowing Laura's truck to run an errand. Morgan arrived at the residence with a rented U-Haul truck, accompanied by his girlfriend, Jennifer Calarco, a detective with the New Hanover County Sheriff's Office. Brenda and Daniel Stocks, Defendant's mother and brother, also came over to the residence while Defendant was gone.

When she had finished packing, Laura called Defendant and asked him to bring her truck home so that she could leave. She then warned Morgan and Colarco that Defendant had placed a rifle in a blue van parked in the driveway; however, Defendant's mother retrieved the rifle from the van before Defendant returned and took it to her residence next door. Morgan pulled the U-Haul "out to the main drive that's in front of their house" to wait for Laura.

Approximately fifteen minutes after Laura's phone call, Defendant "c[a]me flying in the driveway" in her truck. He exited the vehicle and walked past Morgan's open window on the driver's side of the U-Haul. Seeing Morgan and Calarco, Defendant became "[v]ery angry" and asked, "[D]o you think that makes a damn?" – which Morgan interpreted as a reference to Calarco's status as a law enforcement officer.

Defendant continued into his house and came back outside with a shotgun. Standing on the top step of his front porch, he loaded the shotgun and "pointed it right at where [Morgan was] sitting, like right about where the window was[,]" from a distance of no more than thirty feet. Though "in awe of the fact that somebody was pointing a loaded gun at me," Morgan managed to drive the U-Haul forward before Defendant fired. The shot hit the back of the vehicle, sending pellets through the rear door and into the cargo area. Morgan and Calarco called 911 and drove to a nearby church parking lot.

While speaking to Morgan and Calarco, the investigating officers received another call about a "vehicle crash . . . possibly being the suspect[.]" Officers responded to the one-vehicle accident and found Defendant standing beside a blue van less than a mile from his residence. On the way to the

sheriff's annex, Defendant stated "that he wasn't thinking and was mad and that she was taking his kid." During formal questioning, however, Defendant told detectives "that he was upset about his 8 year old child being taken away from him and his wife leaving," but "said he didn't own anything, any shotguns or anything like that, that he didn't do the shooting, he hadn't shot at anybody that day[.]"

On appeal, Defendant contends that the trial court committed plain error in failing to instruct the jury on the offense of assault with a deadly weapon as a lesser included offense of assault with a deadly weapon with intent to kill. *See State v. Riley*, 159 N.C. App. 546, 553-54, 583 S.E.2d 379, 385 (2003). By assigning plain error, Defendant concedes that he failed to request the instruction during the charge conference[1] or object to the jury instructions as given. *See* N.C.R. App. P. 10(a)(2), (4).

## II. Analysis

Our Supreme Court has recently clarified the plain error

---

[1] Although the trial court solicited "objections or suggestions to either the jury charge or the verdict sheet[,]" the court did not "specifically ask[] defense counsel if there were any lesser included offenses" to be submitted to the jury. *State v. Gay*, 334 N.C. 467, 485, 434 S.E.2d 840, 850 (1993) (holding that "defendant foreclosed any inclination of the trial court to instruct on the lesser included offense and is not entitled to any relief on appeal").

standard of review as follows:

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice — that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings. The necessary examination is whether there was a *probable* impact on the verdict, not a *possible* one. In other words, the inquiry is whether the defendant has shown that, absent the error, the jury probably would have returned a different verdict.

*State v. Carter*, __ N.C. __, __, 739 S.E.2d 548, 551 (2013) (citations and quotation marks omitted).

A "'trial court must submit and instruct the jury on a lesser included offense when, and only when, there is evidence from which the jury could find that defendant committed the lesser included offense.'" *State v. Petro*, 167 N.C. App. 749, 752, 606 S.E.2d 425, 427 (2005) (citation omitted). The mere prospect that "the jury could possibly believe some of the State's evidence but not all of it" does not warrant an instruction on a lesser included offense. *State v. Annadale*, 329 N.C. 557, 568, 406 S.E.2d 837, 844 (1991). Rather,

> when the State seeks a conviction of only the greater offense and the case is tried on that all or nothing basis, the State's evidence is not regarded as evidence of the lesser included offense unless it is conflicting; and that the lesser included offense must be submitted only when a defendant presents evidence thereof or when the State's evidence is conflicting.

*State v. Bullard*, 97 N.C. App. 496, 498, 389 S.E.2d 123, 124 (1990) (citations omitted).

Here, the State proceeded on an "all or nothing basis" on the charges of assault with a deadly weapon with intent to kill. *See id.* "Thus, the trial judge needed only to instruct the jury on a lesser included offense if the defendant presented evidence of the lesser included offense or if the State's evidence was conflicting." *State v. Woody*, 124 N.C. App. 296, 307, 477 S.E.2d 462, 467 (1996). Neither circumstance appears in this case.

"The only difference in what the State must prove for the offense of misdemeanor assault with a deadly weapon and felony assault with a deadly weapon with intent to kill is the element of intent to kill." *Riley*, 159 N.C. App. at 553-54, 583 S.E.2d at 385. "An intent to kill is a mental attitude, and ordinarily it must be proved, if proven at all, by circumstantial evidence, that is, by proving facts from which the fact sought to be

proven may be reasonably inferred." *State v. Grigsby*, 351 N.C. 454, 457, 526 S.E.2d 460, 462 (2000) (citations and quotation marks omitted). In this regard, our law provides that "an assailant must be held to intend the natural consequences of his deliberate act." *Id*. Accordingly, "[w]here the defendant points a gun at the victim and pulls the trigger, this constitutes evidence from which intent to kill may be inferred." *State v. Cromartie*, 177 N.C. App. 73, 77, 627 S.E.2d 677, 680 (2006).

Though circumstantial, the State's evidence of Defendant's intent was not conflicting. *See Riley*, 159 N.C. App. at 554, 583 S.E.2d at 385. Morgan testified that Defendant aimed the shotgun directly at him before firing, but Morgan "managed to go forward enough to where it didn't hit the door and the glass where, you know, where it was intentionally aimed and it hit the back of the truck[.]" Calarco likewise testified, "I remembered seeing [Defendant] with a shotgun and looking at us, he then pointed the gun or . . . went to draw the gun up, and I remember looking at [Morgan] and saying you need to go." Laura, who had reconciled with Defendant at the time of trial, purported not to remember exactly where Defendant aimed the shotgun, other than "[i]n the area of the truck." However, she acknowledged giving

a written statement immediately after the shooting in which she affirmed that Defendant "pointed [the gun] at the cab of the truck[,]" and that "[h]e would have shot Jimmy" if the U-Haul had not moved forward. Asked at trial, "What would have happened if the U-Haul had not moved when [he]r husband shot[,]" Laura responded, "I don't know. I mean I'm sure it probably would have been ugly, but I mean I can't speculate because I don't remember exactly where everything took place." Though equivocal, this testimony cannot be said to contradict Morgan's more definite account.[2]

As Defendant notes, the trial court cited the fact that "no shots were fired at the passenger area of the vehicle" in dismissing the charge of attempted murder at the conclusion of the State's evidence. However, the court viewed Defendant's act of shooting the back of the moving U-Haul as insufficiently "close" to a completed murder to qualify as an attempt – *not* as proof that Defendant lacked the intent to kill:

> THE COURT: . . . Bottom line, I think there's certainly enough evidence for the

---

[2] Morgan and Laura did offer differing accounts of whether Defendant "was reloading" the shotgun after he fired on the U-Haul, or merely "cracked it open and emptied the shell[.]" However, "[t]he lack of multiple shots fired does not negate intent to kill." *Cromartie*, 177 N.C. App. at 77, 627 S.E.2d at 680.

> assault with a deadly weapon with intent to kill to go to the jury. I do not believe there's enough evidence that this case came so close to being attempted first degree murder . . . .

Inasmuch as Morgan drove the U-Haul forward as Defendant fired the shotgun, the location of the shot's impact did not amount to conflicting evidence of Defendant's intent.

Nor did Defendant present evidence of the lesser included offense. *See Bullard*, 97 N.C. App. at 498, 389 S.E.2d at 124. The defense called three witnesses, each of whom supported the defense's theory that no shooting had occurred. Defendant's mother and brother denied that Defendant possessed or fired a gun on 12 February 2012. They both averred that Defendant had previously pawned or sold all of his guns; that the blue van and the rifle removed from the van belonged to his mother; and that this rifle had been left in the van by her youngest son. The third defense witness, a neighbor, reported hearing no gunfire on the date in question. In addition to attempting to discredit the State's eyewitnesses, Defendant's cross examination focused on the facts that no gunshot residue testing had been conducted to determine whether Defendant in fact fired a gun and that no weapons or ammunition were found at the scene or recovered thereafter.

Even assuming error by the trial court, its failure to instruct the jury on assault with a deadly weapon did not rise to the level of plain error. *See Carter*, __ N.C. at __, 739 S.E.2d at 551 ("It is not necessary to engage in a discussion of whether an instruction on attempt should have been provided because defendant failed to show that any such error was prejudicial."). Having reviewed the evidence in its entirety, we do not find it *probable* that the jury would have reached a different verdict if it had been instructed on the misdemeanor. Nor is this the "exceptional case" in which the lack of a lesser included offense instruction casts doubt upon "the fairness, integrity or public reputation of judicial proceedings." *Id.* (citation omitted).

NO ERROR.

Chief Judge MARTIN and Judge HUNTER, JR. concur.

Report per Rule 30(e).